Good morning. May it please the Court, Joseph Tregilio for Appellant Mark Wayne Hauser. I'd like to reserve two minutes for rebuttal time, please. Your Honours, there's a number of issues in this case, but the critical one for the jury was Mr. Hauseur's intent when he shot Harold Fauci, the victim. But due to juror biases and his own lawyer's ineffectiveness, Mr. Hauseur was deprived of a jury that could fairly consider Mr. Hauseur's true mental state at the time he pulled the trigger. And the reason for that is because his lawyer failed to present evidence that would have supported his defense. The lawyer's defense in this case was that Mr. Hauseur panicked, overreacted, and accidentally squeezed the trigger when he shot Harold Fauci. But he failed to present any evidence, a shred of evidence, to support that defense. And that evidence, Your Honours, is Mr. Hauseur's acute and significant post-traumatic stress from his father's forced sodomy, molestation, and physical violence inflicted on him, his brother's mutilation and murder of his father, and his resulting drug use. The jury was entitled to hear that evidence, and it was necessary to determine Mr. Hauseur's mental state at the time of the shooting. And without considering it, there can be no confidence in the jury's verdict. Now, let's assume for the moment, and for the purpose of my question, that that evidence realistically could have persuaded the jury, despite the evidence of his companion in the car and so on, that this was an accidental shooting instead of a purposeful shooting. We've got a problem because the evidence that you're wanting us to look at was never presented to the trial court, to the State court. So what do we do with that? Well, Your Honor, the evidence, I think you're referring to the declarations were not presented to the State court. However, Mr. Hauseur presented very detailed allegations in the California State courts that the State court presumes to be true. And those allegations mirror the declarations that were submitted in Federal court. In fact, the declarations in Federal court merely confirm Mr. Hauseur's detailed allegations. So you're telling me that that satisfies the Penholster case? Well, Your Honor, Penholster is not a problem. We have to separate the ineffective assistance claim into two prongs. And for the deficient performance prong, Penholster does not pose a problem because the State courts declined to adjudicate that prong on the merits. And for the prejudice prong, Your Honor, Mr. Hauseur did submit very detailed allegations in his petition that do mirror what the Federal court's evidence states. And he stated, for example, that the evidence of his prior trauma would, and I'm reading from the California Supreme Court petition here, would corroborate and show that in combination with abuse and drugs that he suffered, he was in an altered perception of mind that would possibly and unreasonably cause him to unreasonably fear for his safety and not form a specific intent. So, counsel, one preliminary question and then a more substantive question. Mr. Rosenberg, the trial lawyer, he's passed away, is that correct? Yes, Your Honor, in 2011. That's right. So we can't ask him this question. But if we could, a question I would have for him is there is some indication in the record from the investigator that, yes, the lawyer was made aware of this, and I don't think anyone would disagree, a horrible, horrible childhood for your client, awful. But then we have the problem of once the shooting occurs, your client does certain things in terms of disassembling the gun and throwing, getting rid of the clothing and getting rid of the shell casings and changing the appearance of the truck so it's less, if Mr. Rosenberg is trying to make a PTSD defense to show that this guy had the jitters when this happened and the gun just went off, but then takes these very clinical steps to, my word, wipe away the evidence, why, again, we can't get a declaration from him because he died in a motorcycle accident, I believe. But how do we evaluate whether that was a tactical decision or not, especially when we can't go back to that lawyer? Well, Your Honor, I think first off, regarding Mr. Houser's sort of attempts to backtrack or to cover up, I'll just say that. Yes. Mr. Houser acknowledges and he acknowledges in his trial testimony that he regrets having pulled over. He knows what he did wasn't a good idea. It was wrong. And that's really what he was trying to cover up. He lied to the police and it was a bad idea. However, that has no bearing on the symptomology of his PTSD at the time of the shooting. And he's always maintained that it was an accident. Turning to Your Honor's question about Mr. Rosenberg's sort of trial strategy here, I think the first answer would be Mr. Rosenberg did not meaningfully investigate whether a mental state defense would have worked, given the situation. He ignored his investigators' advice to look into these issues to begin with. So his strategy, and I think this Court said it in Jenning v. Woodford, that counsel is empowered to make tactical decisions, but it must fall after a reasoned decision. And here there was no reasoned decision because there was no investigation. But that said, Your Honor, there was an argument by the counsel that Mr. Houser did panic, that Mr. Houser overreacted. I think he analogized it to someone pressing on a brake instead of a gas pedal. There was that argument to the jury. He just failed to substantiate that with any evidence to the jury. And that evidence, again, was Mr. Houser's impairments that were affecting him at the time of the shooting. As we try to figure out under Strickland what the consequence was of his lawyer's failure to investigate and failure to present, I'll assume for purposes of the question that that was ineffective assistance, that is, he should have done it. But now I'm trying to figure out was it going to make any difference. The evidence against him by Lynn, who was with him in the truck, is just devastating. That is to say, he spots him, does a three-point turn, comes over, parks on the wrong side of the road so that he is, his side of the truck is facing the victim. Victim approaches. He obtains the gun from somewhere in the truck, puts in the ammunition, and then shoots him. I have real trouble seeing that this evidence of childhood abuse is going to convince that jury that this was an accident. How do I deal with that? Your Honor, the fact is that that testimony comes from Andrea Lynn, his accomplice in this case. And no fair-minded jurist could rely on Andrea Lynn's testimony. And the reason for that is because, first, in her first three statements to the police and in her interview with defense counsel, she never mentioned the fact that Mr. Houser put in the clip of the gun or that Mr. Houser stated his intent to shoot Mr. Fauci when he arrived at the scene. It only came in her fourth interview to the police. And that was after she was in custody and had been offered a plea agreement for 120 days in prison and probation. And she, in fact, told the defense investigator that the music was too loud for her to hear anything. And, moreover, she even wrote to Mr. Houser a letter, which she didn't think was going to be publicly disclosed, stating that she was scared about how little she remembered. And that was because of the drugs that she was taking, which the record shows were amnesiacs, which caused her to forget things. Plus, putting all that aside, the jury was instructed to view her testimony with caution because she was an accomplice. Given all those factors, there can't be a fair-minded jurist who would view her testimony as reliable. And, in fact, if you look at the juror declarations, for whatever they're worth, they do state how impactful that mental trauma would have been, notwithstanding Andrea Lynn's testimony. But the case against him gets worse in the sense that we've got him telling a whole series of inconsistent things that the jury knows are lies. So the jury, if they're going to disbelieve Lynn, they're going to disbelieve him even more. Your Honor, again, Mr. Houser did lie to the police. However, he never once stated or admitted or was caught lying about the fact that this was an accidental shooting. That was his one consistent strain this entire time. He tried to cover it. He knew that what he did was wrong here, and he's never argued that he should walk away a free man because of Mr. Fauci's death. He's simply arguing that he lacked an intent to kill, lacked malice, and should be guilty of a manslaughter offense in this case. Counsel, I have a question for you about the juror issue, Juror C.J. and Richardson. And one thing is I've been really struggling with this case is that earlier courts have said that there's a Dixon bar. I know that Judge Siegel didn't say that, but some other judges previously had. And if you could help me out here, where in the record does a court explain why that juror claim about C.J. and Ms. Richardson is barred by Dixon? I'm going to be asking counsel for the State the same question, but does any court actually explain why it is Dixon barred? No, Your Honor. There's no explanation anywhere in the record. There's simply a superior court's decision, the last reason decision, stating in a one-line sentence that the claim should have been raised on appeal. Our position is that that is an erroneous bar. That's an improper bar. In fact, in State court, in the superior court, court of appeal in California Supreme Court, Mr. Hauser submitted declarations in support of that claim. So it couldn't have been based on the record. So that was just an erroneous, wrong bar. That's inadequate to preclude federal review in this case. And we did find, the law clerk actually for me located a letter between Hauser and Ms. Smith, the lawyer, Patricia Smith, is that her name? Okay. In which he says that there's some sort of relationship or the juror knew Ms. Richardson. We found a letter post-verdict. Has there been any lower court analysis of that letter in terms of Dixon? No, Your Honor. And that's in the supplemental, our supplemental excerpt to record. There has not been an analysis. But that is not part of the record. That was a previously confidential letter to his appellate lawyer letting her know that there was these juror misconduct issues. I think the only indication of any juror claim in this case would have to be the victim's wife's tearful outburst. But even that was limited to trial counsels, I think, abridged, alerting the trial court of what happened, which didn't even apprise the trial court of the more significant factors of the victim's wife tearfully confronting the juror with photographs of her deceased husband as out inside in the courtroom. So I think these juror claims are reviewed de novo because that Dixon bar was inadequate. But it also indicated they didn't adjudicate the claim on the merits. Turning to the other juror claims, Your Honor, I would like to discuss the incident of the juror's discussion with the law enforcement officer in the hallway about the trigger pull weight of the handgun. This conversation occurred after the defense investigator, I'm sorry, the defense expert testified about that very topic. In fact, that was the only topic of the defense investigator's testimony was the trigger pull weight and safety of the handgun. And afterwards, the investigator, Mr. Crasco, overheard a conversation, an extended conversation about that issue. We don't know exactly what was conveyed to the juror because we've never had a hearing on this claim. And under de novo review, I think this is a colorable claim that is the least worthy of a hearing because I think this was unauthorized contact between a juror and a third party that warrants the presumption of prejudice under Maddox. That this court explained in the United States versus I think it was Dukell. So I think for that reason, we get a remand on that particular claim. I think the last claim I'll discuss. Was that presented to the state court? Your Honor, that was not. That was an appellate opinion. However, because we're on de novo review, I think that appellate opinion can inform this court's analysis here since we're not bound by Supreme Court law in this situation. I think the last claim that I'd like to discuss is, again, the victim's wife's tearful outburst. And I would just think that I say that the district court applied the wrong set of law about juror misconduct here. And we're saying that the court should have applied the standard that this court laid out in the Ouzladin and Norris versus Riley. Which was that Ms. Fauci's conduct was so inherently prejudicial that it deprived Mr. Hauser a chance of a fair trial. And I will reserve the rest of my time for rebuttal. Thank you. Okay, thank you. I hereby move the government. Good morning, Your Honor. May it please the court. I'm Kevin Viena, California Deputy Attorney General, for respondent and appellee in this matter. The defense counsel in this case faced a difficult challenge. Your Honor, I think you identified a number of the challenges that he faced. But there are some other aspects of that that demonstrate why his tactical choice to pursue a defensive accident rather than some other defense made sense. Most importantly, perhaps, is that his client, Mr. Hauser, told the police in his interview that this was a matter of pure accident. That is, he did not shoot the gun in self-defense. Yes, but the IAC claim is not that he made a mistake in pursuing the defensive accident. The IAC claim is that he didn't support the defensive accident with all this evidence about PTSD and jitteriness and why it would have been an accident. Yes, Your Honor. I take your point and I'll try to respond to it. Similar to your question about what do we do about the fact that defense counsel is now gone and couldn't answer these questions. There is some evidence, and I think particularly important evidence in the record that I didn't discover until last night and is not in our brief, but I'd refer the Court to page, excerpts of record page 339. And that is the writings of Mr. Hauser talking about, it's towards the end of his discussion of why his lawyer was ineffective in failing to present either a voluntary intoxication or effectiveness of drugs or the combined effect of drugs and trauma on him. And in there, he says that he discussed. Where are you reading from? Excerpts of record page 339, Your Honor. I got that. It's a big page with lots of words on it. And I beg your pardon. Thank you for your indulgence. Allow me to retrieve that. At lines 23 through 25, he says, That's mental health disorders and psychological treatment. I'm sorry. My line 22 says would have found the petitioner's long history of something like that. 339? Excerpts of record, not the supplemental excerpts. Yes, ER 339. All right. Line 23 begins with the words health disorders. Okay. I thought you said 22. 23, go ahead. All right. Health disorders and psychological treatment, which is why he told the petitioner not to claim this defense during the trial. Even going so far as to explain why, I think what he means is why this defense would not have been successful. And I believe I can ‑‑ I think it's clear why he told his client not to try to ‑‑ that this would not have been a useful and helpful defense to raise at trial. Principally, it is that to have gone into his trauma would have strongly corroborated something away from which defense counsel ran throughout the trial. That was Mr. Hauser's statements to the police that one of the reasons that he was upset with the victim in this case was his belief that that victim had sexually abused either children or a woman that he knew. And that Mr. Hauser had never received ‑‑ had never achieved retribution for the trauma that he had done. So this evidence, that is, the PTSD evidence, would have strengthened the prosecution's argument about motive. That is, he did this because of his own sense of lack of closure with the trauma that he had suffered as a child. And it also would have supported additional arguments about his ‑‑ about why he reacted so impulsively and strongly when he drove past the victim on the road that day. Although it wasn't ‑‑ Is there any evidence that, in fact, the victim did engage in any sort of sexual abuse of children beyond the fact that Mr. Hauser at one point accuses him of that? No, I think there's not. And, in fact, defense counsel, as I said, defense counsel ran away from this. He tried to make it very clear that there was no such evidence. And the reason ‑‑ because he was worried about that as motive evidence. But you're saying because he's worried about that, you're inferring that. Yes. You have no direct evidence of that. That's absolutely correct, Your Honor. I have no evidence that the victim had actually done this. But the question is ‑‑ Or do you have any direct evidence that that was the motivation of the attorney? You're inferring that from the fact that Hauser at one point accuses the victim of having done child abuse. And that we have the defense counsel not raising these ‑‑ his childhood. Yes. I can do it by no other way than inference. But that's all you've got. Yes, it is, Your Honor. The PTSD might have provided some support to ‑‑ well, the other difficulties that defense counsel faced were that his client quite clearly denied that his ‑‑ that he was suffering any perception difficulties at the time of the event. He said that he was not affected by drugs or anger. Supplemental excerpts of record 201, 203, 233. He said as clearly as he could have that this shooting did not involve self‑defense. It was not an exercise of self‑defense. Supplemental excerpts of record 196 and 197. He said that he never saw a weapon. He hasn't suggested that PTSD caused him by the exercise of hypervigilance to see something that wasn't there. He said that he was afraid of the victim because he was twice his size. He said he was afraid of him. But he specifically declined to answer or declined to respond to the prosecutor's question. The page ‑‑ it's excerpts of record 641 and 642. The prosecutor said, did you think you were about to be killed by the victim? And he said, I can't answer that question. So those answers, which I presume he went over with his lawyer in advance of trial, those answers would have precluded his defense counsel from successfully mounting a voluntary manslaughter defense based on PTSD. Finally ‑‑ I don't see that that's true. It might have made it a little more difficult. I don't see that it precluded it at all. He says, listen, I was not afraid for my life. Yeah. But he says I was jittery. I was aroused. If he was truly afraid for his life, he had a self‑defense argument, which he wasn't making. And he said quite specifically ‑‑ I'm sorry, Your Honor. Please forgive me for interrupting. He said quite clearly, I did not shoot this man in self‑defense. Yeah, right. I understand. And while the jitteriness might have caused him to be apprehensive, in order to succeed on self‑defense or imperfect self‑defense, he has to believe that great bodily injury is imminent. And he declined to say that. He was pressed by the prosecutor, and he never said anywhere that he feared imminent bodily harm. And that's essential to the defense of self‑defense or imperfect self‑defense. I understand, but I think we're talking past each other. I understand perfectly that he's not making either a perfect or imperfect self‑defense argument. He's making an argument of accident. Okay. All right. And so, yes. And the jitteriness certainly could apply to accident. And the statement of Mr. Stewart, Dr. Stewart, that it might have affected, there might have been some motor impairment might have supported the defense of accident, might have supported the defense of accident. On the other hand, the evidence of PTSD, even according to Dr. Stewart, would have included that the symptomology of PTSD is impulsivity and irritability, which, if combined with the strengthened evidence of motive, would have harmed him and would have been stronger evidence of intentional premeditated killing at the time he turned up there. So I think when you look at it in that light, then counsel's decision not to pursue that and explaining it to his client why he wouldn't pursue it is not deficient counsel performance. What about the conversation of the juror about the trigger pull? I mean, this seems to be sort of at the heart of the issue. Some guns are very hard to accidentally. Yes. And the evidence in this case was quite clear that this one was not such a gun. That is, the evidence was before the jury that this- It was a semi? It was semi-automatic and that the defense called an expert who testified without contradiction that the trigger pull on this weapon was six and a half pounds, that the New York City Police Department had difficulties with this weapon and had it modified to have an increased trigger pull of 13 pounds, that it had had other alterations made to the weapon because of the danger of accidental discharge. So whatever discussion there might have been, and that remains sort of speculative, but whatever discussion there might have been about trigger pull, even if it did apply to this weapon, there's no suggestion that it would have affected the outcome of the trial or had any influence because it would likely have been. Or at best, as most helpful to Mr. Hauser,  that is, this had a light trigger pull and there were problems with accidental discharge. But we don't know what the conversation was. That is to say the officer could have said, light trigger pull, phooey. Anybody who knows about firearms, and Mr. Hauser did know about firearms, knows darn well when he's pulling the trigger or not. I mean, that could well have been said and I wouldn't be surprised if it had been said. I can't dispute that it could have been said, Your Honor. Do you agree, then, that those claims are not procedurally barred? I know the court below said, but again, the Dixon question, I just don't see it here. I think, well, the superior court's order is not a model of clarity. I think we all agree on that. And I'm here again sort of trying to explain California's procedural defaults to the court, and that's often a challenge. But what the court said, and the order is set out in Excerpts of Record, page 37. It's quoted in the report and recommendation of the magistrate judge. Petitioner raises several contentions of error which should have been raised on direct appeal. So several. I think that probably clearly applies to the question about juror immunity. It probably applies to the question about the victim's wife, because there was at least something in the record about her conversing with jurors in the trial and being admonished both in advance of trial and then during a recess during argument. It should not apply, I think, should not apply to the trigger pull issue, because I don't see that that was discussed in the record in any way. So what we're left with then is how to deal with a State court's decision that does not say that all of his contentions except for the ineffective assistance of counsel claims should have been raised on direct appeal. Instead, it says several. And several contentions of error which should have been raised on direct appeal. Several, I think, means that there are others that did not have to be raised on direct appeal. That would leave us at least, I think perhaps the best way to look at it, that leaves us with this. We have a silent denial of those claims that are not properly denied on the basis of Dixon. And if we have a silent denial, then the question is, is there a basis? Is there a rational basis for the State court's denial of that claim? And I think because the magistrate judge did essentially address those on all of those claims, alternatively under de novo review, that explains how a State court, how a fair-minded jurist could have reached that conclusion, that is that the claim lacked merit. But I agree that I have to strain to make that argument. But I want to assist the court, and I'd like to be an advocate, in saying what is the proper and best way to look at that. I think that's it. Thank you. Thank you, Your Honor. Thank you, counsel. Your Honors, I'll just address two points that Respondent made regarding the ineffective assistance claim, the first having to do with Mr. Houser's initial statements to the police about the victim's purported multiple-use assault. Your Honors, that evidence was coming out one way or the other. That evidence came through a letter that Mr. Houser wrote to Andrea Lynn and his old roommate saying, stop saying that to people. It's not true, and it makes me look like I premeditated. That evidence was coming out, and so counsel reasonably had to take that on one way or the other, and so that can't be the reason why he chose not to present evidence of Mr. Houser's impairments, to prevent it coming out, because it was coming out anyway. Regarding the perfect self-defense point that Mr. Houser explicitly disavowed, a perfect self-defense theory here, that is true. He did not want to excuse, justifiably excuse, his homicide based on the fact that, in fact, there was a real fear. But Mr. Houser's testimony also said that Mr. Fauci was aggressively approaching him, that he saw something in his hands, and that he felt intimidated. Now, standing in the courtroom, I think Mr. Houser would know no one would be in fear for their life. But you have to look at PTSD symptomology, which causes dissociation, which causes hypervigilance in that situation, and it causes distorted memory, which Mr. Houser admitted to having throughout in his statements to police and at testimony. In fact, the prosecutor in closing arguments said, tried to paint Mr. Houser further as a liar by saying, look, he conveniently forgets everything about the shooting, but remembers what happens before and after. Well, that is a hallmark of PTSD that needed to be explained. So that's my response to that claim. Regarding the juror claim, the conversation about the accidental discharge, I think that does cut directly to the heart of the defense in this case. And we do need a hearing to flesh out what was said. And that's the reason. I think it's very possible the police officer in that case indicated it was a bogus defense to say there was a light trigger pull. The fact was the NYPD put a heavy trigger pull because of her accidental discharge, even with a six-and-a-half-pound trigger weight. Are there any further questions? I'll submit. Okay, thank you. Thank you, counsel. Our case is argued with abstention.
judges: Kozinski, Fletcher, Owens